Statement of Facts.

COMMONWEALTH v. PHILA. ETC. R. CO. ET AL.

APPEAL BY DEFENDANTS FROM THE COURT OF QUARTER SESSIONS OF PHILADELPHIA COUNTY.

Argued March 26, 1890—Decided May 26, 1890.

[To be reported.]

1. The mere plotting of streets upon a city plan in pursuance of a statute authorizing the making of a plan exhibiting " where and in what manner such streets, etc., will in future run," vests in the public no right to use them for travel: proceedings to open are necessary before they become actual streets and the exclusive possession of landowners can be interfered with.

2. Such plotted streets may become actual highways merely by public user, but the user which will effect that result must be defined, uniform, adverse, and under claim of right, and must have continued for twenty-one years; a permissive user for less than twenty-one years, may, however, establish a public right, if attended by public expenditures and by circumstances clearly indicating the owner's design to surrender control to the public.

3. Upon the trial of an indictment for obstructing a street so plotted, witnesses, who have testified for the commonwealth to travel by the public upon it, may be asked upon cross-examination questions tending to bring out the fact that the travel referred to in their testimony was not uniformly along the lines of the street, but was without regard thereto, and without any defined or located paths.

4. The mere fact that a fence, erected by a railroad company along the line of its right of way, is shown to enclose some ground within the lines of a plotted street that was once occupied by a pavement, the street having been opened, in fact, and paved by the city up to the company's tracks, is not sufficient to sustain an indictment for obstructing the street, when no authority for paving across the company's line is shown.

Before PAXSON, C. J., GREEN, CLARK, McCOLLUM and MITCHELL, JJ.

No. 30 January Term 1890, Sup. Ct.; court below, No. 305 August Term 1888, Q. S.

To the number and term in the court below, the Philadelphia & Reading Railroad Company and Isaac A. Sweigard, its superintendent, were indicted for erecting and maintaining a

public nuisance, the first count of the indictment charging that the defendants had erected and maintained a certain board fence upon a certain public highway, to wit Chatham street, in the city of Philadelphia, thereby obstructing it, to the common nuisance of all the good citizens, etc., and subsequent counts separately charging similar obstructions of Gaul, Walker, Belgrade, Almond, Edgemont and Thompson streets, in said city. The defendants pleaded not guilty.

At the trial on May 27, 1889, the following facts were shown:

In 1837 the Philadelphia & Reading Railroad Company acquired a right of way for its road, sixty-six feet in width, through the locality in which the obstructions complained of in the indictment were alleged to have been erected. Prior to 1849, said company constructed six tracks upon that right of way. In 1849, the streets mentioned in the indictment were plotted upon the official plan of the then district of Richmond, which embraced the locality in question, in pursuance of § 16, act of February 27, 1847, P. L. 181, incorporating said district. They were not then opened, nor were any legal proceedings to have them opened ever had, so far as was shown. According to the plan, these plotted streets crossed the tracks of the defendant company's railroad.

In 1850, the commissioners of the district of Richmond entered into an agreement with the railroad company, by which, for certain considerations, the district granted to the company the right to appropriate and use, for the purpose of laying tracks, etc., a strip of ground or highway adjoining its railroad on the north, thirty feet in width, and a similar strip on the southern side of the railroad, fourteen feet in width, the company agreeing, among other things:

"III. That they will build and maintain under the line of the embankment of their road at the point at which Cedar street crosses it, a culvert or tunnel of the width of thirty feet, to afford a passage under the track of said road.

"IV. That should the laying of their tracks in pursuance hereof, upon the southwardly side of their present property and road, require any embankment, the said embankment shall, upon the southwardly side thereof, be maintained and supported by a vertical wall, leaving the passage-way as above specified."

VOL. CXXXV—17

On January 20, 1852, having in the meantime procured legislative authority by § 4, act of April 3, 1851, P. L. 303, for their arrangement with the railroad company, the commissioners of the district executed a new agreement with the company substantially to the same effect.

Although no legal proceedings to open the streets named in the indictment were shown, the testimony for the commonwealth tended to prove that in fact those streets were opened and paved by the municipal authorities at different times, as the growth of population rendered their use as streets necessary, one witness testifying that Edgemont street was paved thirty years, and Thompson street twenty-eight years, prior to the trial. An ordinance for the paving of Thompson street, however, which was enacted in 1871, was put in evidence; and ordinances for the grading and paving of Belgrade street, enacted in 1872, were also put in evidence, but none of the ordinances provided for any paving upon and across the railroad. Most of the streets named were opened and paved, on each side of the railroad, up to the roadbed. Others were paved on one side of the railroad only.

In 1874, the district of Richmond having become by consolidation a part of the city of Philadelphia, the councils of the city enacted an ordinance authorizing the execution of a contract between the city and the railroad company for the making of changes in the railroad and in Richmond street, located one square beyond the easternmost of the streets named in the indictment, so as to carry the company's tracks across Richmond street by means of a bridge. During that year, in pursuance of that contract the grade of Richmond street was depressed, the grade of the railroad was raised, and a substantial bridge across the street was constructed. While this work was in progress, the travel of Richmond street was deflected to Edgemont street. A planked way across the tracks, upon the plotted line of the latter street, was constructed, and, in connection therewith, a street-railway track, which had been laid upon Richmond street, was removed to Edgemont street and laid across defendant company's railroad. The crossing thus constructed was used both for the street cars and for general travel, until the completion of the bridge over Richmond street, when the street-railway track was moved back to Richmond

street, the planking taken up, and that part of the defendant company's roadbed, lying within the plotted lines of Edgemont street, was restored to its former condition, travel across the tracks with vehicles at that point ceasing.

The raising of the grade of the railroad at Richmond street involved the elevation of the roadbed for some distance on each side of it, and accordingly the railroad company constructed an embankment for that purpose extending across the plotted lines of all the streets named in the indictment, the height of which gradually decreased as it receded from Richmond street. After its original construction, this embankment was widened to make room for additional tracks. Testimony for the commonwealth tended to show that in connection with its construction and widening, portions of the paving which had been laid by the municipal authorities on Gaul, Almond and Edgemont streets, upon the northern side of the railroad, were torn up or covered up, and that the roadbed, as widened, occupied pieces of ground, within the lines of those streets, which had once been paved and open to travel, about fifty feet of paving having been so torn up on some of the streets.

In 1888 the railroad company constructed a fence along the northern side of its road, crossing the plotted lines of all the streets mentioned in the indictment and enclosing with the railroad portions thereof which, according to the testimony for the commonwealth, had previously been occupied by paving. Benjamin B. Newton, the officer of the company under whose supervision the fence was constructed, testified for the defendant that, to the best of his knowledge, there were no portions of any paved streets included within the fence, and that when erecting it the witness disturbed no pavements and saw no evidence of any within the line on which the fence was placed.

The commonwealth called a number of witnesses who testified that for many years prior to the raising of the grade of the railroad, people had been in the habit of crossing the railroad upon the plotted streets, and that the spaces between the rails had been so filled up with cinders that vehicles could be and were easily driven across, one witness testifying that he had driven across on some of the streets as early as 1846; and that after the change of grade had been made, although vehicles all went to Richmond street to cross, foot travel still continued across the railroad upon the lines of the other streets.

## Statement of Facts.

Edward McColghan, a witness for the commonwealth, who testified on his direct examination to the fact that people were in the habit of crossing on foot, at these points, prior to the erection of the fence, was cross-examined upon that subject as follows:

Q. Suppose you wanted to go diagonally across the railroad, from a place where one street struck the railroad to a place where another street struck the railroad on the other side, you would cut across diagonally, wouldn't you?

Objected to.

By the court:. Objection sustained; exception.[1]

Mr. Hart: I offer to prove whether there was anything at all in the use by people, except the fact that they passed on foot across this property wherever they pleased, from one point to another, simply because there was no fence or material physical obstruction to stop them.

By the court: That would simply show that you gave the public the right to pass over all of your property there.

After some discussion upon the condition of the record, on Mr. Hart's objection and his statement that he had made an offer, the court stated: You have asked a question, and I have ruled it out. Then you argued it. Now, if you have any offer to make, you may make it.

Mr. Hart: It would be in the form of asking him the question, and I see that your honor has covered that. (To the witness:) Was there at any one of these places, except Edgemont street, that you have alluded to, at any time, anything physically on the ground to indicate a crossing at that place different from any other place over the railroad? A. The streets were paved in to the railroad, and they generally cross where the streets are. paved. We look for an opening to cross. . . . .

Q. I ask you whether on the ground there was anything physical that was different between the place where you crossed and any other place on the railroad? A. I didn't see any.

Q. Is it not the fact that the entire space from Richmond to Gaul streets .was. an open space occupied by railroad tracks, and that the people, prior to building the fence in question, for some years walked over this open space as an open common, without any regard to alleged street lines, going about indis-

Statement of Facts.

criminately? This, for the purpose of showing that the alleged use of the property was not such as established, or tended to establish, rights of way at the points alleged by the commonwealth.

Objected to.

By the court: Objection sustained; exception.[2]

Henry Christian, another witness for the commonwealth upon the same subject, was asked upon cross-examination:

Q. And they not only crossed at the intersection, but between the intersections and diagonally, and went up and down, longitudinally?

Objected to.

By the court: Objection sustained, exception.[3]

Q. You lived there in this immediate neighborhood: did you ever see any use of any of these streets, other than when Richmond street was blocked in 1874, and Edgemont street was crossed by the passenger railway,—did you see any use of any of these places by horse and wagon coming across? A. No regular use; no. It had been used once in a while; that is, when Richmond street was blocked up. It was not a regular use for horses and carts or wagons.

Q. Was there any planking at any one of these places? A. No planking.

Q. Was there anything to indicate, at any one of these places, anything different on the railroad from what it was at any other place on the railroad? A. No. The road was on the level with the streets, and there was only rails projecting.

By the court: I think the only inquiry here is whether the public used them. Primarily, the use of our public streets is for foot-people. It is a matter of no consequence whether wagons can or cannot cross. They have a right, of course, to use the street with vehicles or animals, but they are secondary to the right to travel by foot, and, therefore, if the commonwealth shows a use by people walking over it, that is sufficient. It is a matter of no consequence whether they use it with horses or vehicles, or not. If the witness speaks of travel by vehicles or animals, you can cross-examine him upon that.

Thomas Mulville testified for the commonwealth that, prior to the raising of the tracks, people in the neighborhood, passing to and fro along those streets, crossed the railroad once in

Charge of Court below.

a while, "when they got an opening; that is, when the cars would not be left on the track. There was usually cars running up and down. You might stand there may be half an hour before you could pass over some of them." Thomas Judge, a witness for the commonwealth, testified on cross-examination that persons crossing the railroad would frequently climb over, go around or go under cars, and at other times, when there were no cars there, they would have perfect freedom of crossing.

At the close of the testimony, the court, FINLETTER, J., answered the points submitted by the defendants, and charged the jury, as follows:

The defendants request the court to charge the jury:

1. The bill of indictment in this case alleges that the defendants obstructed certain public streets and highways "being for the citizens of this commonwealth to go, pass, walk and travel upon, at their will or with their horses, carriages, carts and other conveyances." It is necessary under this bill for the commonwealth to prove that the streets named in the several counts of the indictment, to wit, Chatham street, Gaul street, Walker street, Belgrade street, Almond street, Thompson street and Edgemont street were, at the time of the commission of the acts complained of, public streets and highways open for the passage of the citizens of the commonwealth with or without horses, carriages, carts and other conveyances.

Answer: Affirmed.

2. In order to maintain the bill of indictment in this case, it is necessary for the commonwealth to prove that the streets named in the several counts of the indictment had, before the acts complained of, been laid out as " streets,".that is, as highways upon which horses, carriages, carts and other conveyances could pass, by lawful authority; that is, by some proceeding provided by the law for the opening of streets in the city of Philadelphia.

Answer: Refused.[4]

3. There is no evidence in this case that any of the streets named in the several counts of the indictment have ever been duly opened as public highways by any legal proceeding whatever.

Answer: Refused.[5]

Charge of Court below.

4. The evidence in this case shows that the defendant duly acquired in the year of 1839 a right of way for its railroad sixty-six feet wide for the entire distance between Richmond street and the westernmost of the streets named in the bill of indictment, and that an agreement was made January 20, 1852, between the railroad company and the then district of Richmond, by which the former acquired the right to occupy with tracks thirty feet additional on each side of its original right of way. It also shows that the streets named in the bill of indictment were not even plotted upon the plan of the city previously to 1849. They could not, therefore, be legally opened over the right of way of the railroad company, without due legal proceedings and the payment or release of damages, or a dedication of the ground occupied thereby by the railroad company, or unless the streets became such by prescription.

Answer: Refused.[6]

5. To prove a dedication, an intent to dedicate must exist and be shown. There can be no intent to dedicate ground for a street inferred from the evidence in this case, and the evidence in this case does not show that the streets named in the several counts of the indictment have ever been dedicated by the Philadelphia & Reading Railroad Company as public highways.

Answer: Affirmed, that there is no evidence of formal dedication.

6. There is no evidence in this case that the streets named in the bill of indictment, except Edgemont street, have ever been continuously used by horses, carriages, carts and other conveyances. The evidence does not therefore show that they ever were public streets, in the sense in which the term is used in the city of Philadelphia, and the sense in which it is used in the bill of indictment. The evidence with relation to the use of Edgemont street in 1873 and 1874, by horses, carriages, carts and other conveyances, shows that the use was a temporary one agreed to by the defendant for the time only during which Richmond street was impassable in consequence of the construction of the railroad bridge over that street.

Answer: Refused.[7]

7. The evidence on the part of the commonwealth, that, for many years before the commission of the act complained of,

Charge of Court below.

people of the neighborhood had passed on foot across the railroad and property of the defendant company, upon the lines of the streets mentioned in the counts of the bill of indictment, merely because there was no physical obstruction to prevent them doing so, is not sufficient to maintain the requirements of proof on the part of the commonwealth that the said streets were public streets or highways by prescription.

Answer: Refused.[8]

8. The mere use of a way by the public for the space of twenty-one years will not vest the title in them thereto by prescription, unless the user be adverse and under claim of right. Where such user is with the knowledge and acquiescence of the owner of the land traversed, and under his leave and favor, by his permission and at will, no title by prescription can arise. The evidence in this case is not sufficient to show that the streets named in the bill of indictment ever became public streets or highways for the passage of persons, horses, carriages, carts and other conveyances, by reason of prescription arising from any adverse use of the same.

Answer: Refused.[9]

9. The defendant could have certainly erected the fence in question in 1849, and it has not lost this right simply because it did not then exercise it, and because since that time, in consequence of the absence of a fence, people have passed over the railroad of the defendant within the lines of the streets mentioned in this indictment.

Answer: Refused.[10]

10. The fact that people of the neighborhood crossed the right of way and property of the company, not only in the lines of the streets mentioned, but in other directions, diagonal and longitudinal, shows that there was neither dedication nor adverse user of the right of way of the railroad company for the purpose of the streets mentioned.

Answer: Refused.[11]

11. The railroad of the defendant company is a public highway, and no one, either individual or the public, can acquire a right therein by an adverse use thereof. No length of time will give a right based upon an alleged adverse use. A right to pass over the railroad within the lines of the streets mentioned cannot arise from any alleged adverse use by the people of the neighborhood.

Charge of Court below.

Answer: Refused.[12]

12. That it was within the power of the Philadelphia & Reading Railroad Company to elevate its roadway from Richmond to Cedar street in 1874, at the time of the erection of the bridge over Richmond street under the contract with the city of February 18, 1874, and that there is no question for the jury arising out of the said elevation, and the jury cannot find a verdict by reason of the said elevation or on account thereof.

Answer: Affirmed.

13. Under all the evidence in this case the verdict of the jury should be for the defendants.

Answer: Refused.[13]

Anything which obstructs the free use of a public street or highway by foot-passengers or vehicles is a public nuisance. [The streets mentioned in the bill of indictment, and referred to in the evidence, were plotted and dedicated to public use in 1849. All of them were subsequently opened for public use, and some of them were paved and graded up to and beyond the points now occupied by some of the tracks of the defendant railroad.] [14]

In 1888, the defendants erected a fence which entirely obstructs travel of any kind. [This they had no right to do, unless they were owners of the land enclosed by the fence. A mere right of way over the land would not give them the right to enclose the land by a fence, nor in any other manner. A right of way for a special purpose, such as a railway, gives the right to use the land for all the purposes of a railroad. If a fence is necessary for this special use, they have, then, the right to erect a fence. If a fence is not necessary for this special use, then there is no right to erect a fence or any obstruction; and any erection of that kind which interferes with public travel is a public nuisance. If, then, the defendants have not shown that they are owners of the land enclosed, or that they had a right of way over the land, and that the fence or enclosure is necessary to the full enjoyment of that right of way, they have no right to erect a fence; and, if it obstructs public travel of any kind, they are maintaining a public nuisance and should be convicted.] [15]

If, however, you should find from the evidence that the defendants are the owners of the land, or had a right of way,

Charge of Court below.

which for its reasonable use required the fence, then another question arises for your determination.  It is, had the public acquired the right of passage over the railway at the points indicated by the streets named in the bill of indictment? There are several ways by which the public and individuals may acquire the right of way or passage over the land of these defendants in this case, or the land of individuals.  They are, first of all, by purchase; secondly, by a formal dedication to the public use by the owners of the land; third, by permission by the owners; and fourth, by permitting the public to use the land, and permitting the public to incur expense in using it.  The commonwealth has given no evidence of purchase or of formal dedication of this land by the defendants, the alleged owners, and, therefore, you will not consider the question of purchase or of formal dedication.  The commonwealth's witnesses are confined to permissive public use, and permissive public use in which expense has been incurred by the public in the exercise of the permission to use it as a public thoroughfare.

[Permissive use must be open, notorious and continuous for upwards of twenty-one years, and must be without objection on the part of the owner.  If the evidence in this case shows a continuous, open and notorious use of these crossings as public streets, then the question arises, were they so used without objection on the part of the owners, the defendants, the railway?] [16]  [All the witnesses speak of foot-passengers, and some speak of the passage of vehicles over these crossings. Now, was this public use of such a character as that the defendants or the owners, the railway or its officers, must have known it?  If it was, then you may presume that they knew this use of their land by the public and for a public crossing.  If they knew it, what evidence is there that the Philadelphia & Reading Railroad, its owners or its officers, at any time objected to its use?  Or, what evidence is there that they did or said anything to show that such use was against the will of the owners of the road, or against the desire of the owners of the road, that the public should so use it?] [17]

[If these crossings, or any of them were so used by the public for upwards of twenty-one years as public crossings, the right of the public to use them, or any of them, as public streets

is established ; and, if the defendants have obstructed them, or
any of them, so that full, free passage in every or any way is
obstructed, then they are guilty of maintaining a public nui-
sance and should be convicted.] [18]

[Permissive public use whereby the public has expended
money need not be for twenty-one years. Any less time, suf-
ficient to show that it was so used by the public, and expense
incurred thereby, and for the purpose of public use as a high-
way, is sufficient to establish the public right to continue such
use ; and any obstruction to this use as a crossing which inter-
feres with travel of any kind is a public nuisance, and if the
defendants have so obstructed it, then they are maintaining a
public nuisance and should be convicted.] [19]

The jury rendered a verdict of guilty. A rule for a new
trial having been discharged, the court pronounced judgment
upon the defendant, Isaac A. Sweigard, that he pay a fine of
$1,000, pay the costs of prosecution, and undergo imprisonment
in the county prison for the term of six months. Thereupon
the defendants, having obtained a special allowance, took this
appeal, assigning for error :

1–3. The refusal of defendants' offers.[1 to 3]

4–13. The answers to defendants' points.[4 to 13]

14–19. The parts of the charge embraced in [  ] [14 to 19]

*Mr. Thomas Hart, Jr.,* and *Mr. George R. Kaercher* (with
them *Mr. J. S. McKinley* and *Mr. Gavin W. Hart*), for the ap-
pellants :

1. That people may have crossed over the railroad upon the
lines of these streets as plotted, is no evidence that they had
become highways, if the same use was made of the spaces out-
side of those lines, and the crossing was a rambling one, not
according to any defined lines : Arnold v. Cornman, 50 Pa. 361.
The defendants were entitled to show that such was the fact
by cross-examining the commonwealth's witnesses. Except at
public crossings, a railroad company has exclusive control of
its right of way, and may fence the same : Plymouth R. Co. v.
Colwell, 39 Pa. 337 ; Oakland Ry. Co. v. Keenan, 56 Pa. 198 ;
Phila. etc. R. Co. v. Hummell, 44 Pa. 375 ; Lance's App., 55
Pa. 16 ; Railroad v. Norton, 24 Pa. 465 ; Mulherrin v. Railroad

Arguments.

Co., 81 Pa. 366; Junction R. Co. v. Philadelphia, 88 Pa. 424; Boston Gas Light Co. v. Railway Co., 14 Allen 444; Presbrey v. Railroad, 103 Mass. 5.

2. Mere permissive use of a way by the public, will not create a public highway by prescription; the user must be adverse and under a claim of right: Root v. Commonwealth, 98 Pa. 170; Esling v. Williams, 10 Pa. 126; Demuth v. Amweg, 90 Pa. 181. Again; the adverse use must have been as extensive as the claim. The indictment alleges the existence of streets, in the full and complete acceptation of the term, and it is not sufficient to show an adverse use by foot travelers: Darlington v. Painter, 7 Pa. 473; Jones v. Crow, 32 Pa. 398: Arnold v. Cornman, 50 Pa. 361; Stewart v. Frink, 94 N. C. 487 (55 Am. Rep. 619.) It was necessary for the commonwealth to show legal proceedings to open, or formal dedication, or presumptive dedication, by some act of the railroad company defining boundaries and distinguishing the part set aside for street uses from the residue of its right of way.

3. There may be a partial dedication, as for a footway only: Angell on Highways, §§ 139, 140; Gowen v. Exchange Co., 5 W. & S. 141; Poole v. Huskinson, 11 M. & W. 827. But, in this case, there was no evidence of any dedication, the places never having been put in condition as a street or footway: Woodyer v. Hadden, 5 Taunt. 126. No proceedings to open these streets were shown, and the proof was affirmative that nothing was done to indicate the existence of street lines across the railroad. And the court erred in stating to the jury as a fact that the streets were dedicated to public use, and in submitting to them a case not sustained by evidence: Greber v. Kleckner, 2 Pa. 289; Penna. R. Co. v. Zebe, 33 Pa. 318; Phila. etc. R. Co. v. Alvord, 128 Pa. 42; Musselman v. Railroad Co., 2 W. N. 105. There was no evidence of other than permissive user, and the only general user of one of the streets, Edgemont, is shown to have been but temporary, and to have ceased when the necessity which caused it ceased.

*Mr. George S. Graham,* District Attorney, and *Mr. Richard P. White* (with them *Mr. Thomas Earle White*), for the appellee:

1. Even if we grant the contention of the defendants' coun-

Arguments.

sel that there was nothing to show a public way across the tracks, nevertheless, as the fence was set up on and included within it portions of public streets which had been opened and paved, its erection was a public nuisance of which the jury was bound to convict. Therefore, no error in the charge, if such existed, could have injured the defendants, and error causing no injury is not ground for reversal: Eldred v. Hazlett, 38 Pa. 17. That the use of these streets by the public, both on foot and with vehicles, as disclosed by the testimony, together with the fact that they were plotted on the city plan in 1849 and paved by the city as far back as 1859 and 1860, constituted an implied and complete dedication to public use, up to the edge of the original six tracks, is sustained by an overwhelming mass of authority: Commonwealth v. Cole, 26 Pa. 189; Schenley v. Commonwealth, 36 Pa. 29.

2. It appears, however, that the railroad company recognized the right of the public to cross its tracks in the line of the streets in question, by filling up the crossing between the tracks with cinders, etc., and that this was done as long ago as 1845, and the tracks remained thus until 1874. It is hard to see, how, under the authority of Commonwealth v. Cole, supra, this, together with public user, could fail to operate as a dedication to public use. It is argued that nothing was done toward indicating the lines of the streets across the railroad roadbed. But the lines of the streets and their acceptance by the city as continuous public highways, are proved by the paving up to and beyond the railroad, in straight and continuous lines, and it then became the duty of the company to maintain the crossings in good order and repair: Pittsburgh etc. Ry. Co. v. Dunn, 56 Pa. 280. The authorities above cited dispose of the numerous specifications of error relating to permissive public use, with or without public expenditure.

3. Even if the negative method of disproving a way across the railroad had been admissible, and, if the exclusion of the questions put to McColghan and Christian on cross-examination would have been error, where the disputed point was the existence of such a way, such exclusion was proper in this case. The defendants were not indicted for obstructing a way across the railroad, but for erecting and maintaining a fence upon certain highways, and that these streets were highways up to the

Opinion of the Court.

edge of the original tracks is undisputed. If we grant the most favorable answers possible to the excluded questions, the usurpation of so much of the streets as had become public highways, by including a portion thereof within the fence, would still remain unexplained, and the defendants must still have been convicted. We submit, however, that the fact that witnesses and others walked along the roadbed at times, occasionally crossing it diagonally from street to street, was immaterial, and neither proved nor disproved the existence of a public way in the line of the streets.

OPINION, MR. JUSTICE MITCHELL:

This is an indictment for a public nuisance by the erection and maintenance of a fence along the line of the railroad between Richmond and Cedar streets, in the city of Philadelphia, formerly in the district of Richmond, whereby certain streets named are obstructed. The first step necessary in the commonwealth's case, therefore, is proof that the places obstructed are public highways or streets. The railroad was located in 1837, and the right of way acquired in 1839. The present streets were plotted on the public plan of the district of Richmond, confirmed September 18, 1849, under the authority of the act of assembly incorporating the district of Richmond, February 27, 1847, P. L. 181. The records of the department of surveys do not show the existence of any of the streets named in the indictment, prior to the plan of 1849, and that plan made them streets only on paper, mere plotted lines, to show for the public convenience, in the language of § 16 of the act of 1847, " where and in what manner such streets, roads, lanes, and alleys will in future run." Such plan did not, of course, acquire for the public any right of use for travel. Proceedings to open were still necessary before there would be any actual streets, and before the title of the owners or their exclusive possession and use of the land could be interfered with. No such legal proceedings were ever taken by the district of Richmond or the city of Philadelphia to procure the opening of any of the streets in question across the defendant's road. Some of the streets appear to have been opened in fact up to one side of the railroad, and some on both sides, but no evidence was given as to any legal proceedings under which

any of these openings were made. These facts, so far stated, are undisputed, and the commonwealth concedes that it has not shown any formal opening across the railroad, but relies on public user and implied dedication.

The use which will establish such a right must be defined, uniform, adverse, and under claim of right, and must have continued for twenty-one years. A rambling use, sometimes by one path and sometimes by another, will not suffice: Arnold v. Cornman, 50 Pa. 361; nor will a use by the permission of the owner: Root v. Commonwealth, 98 Pa. 176, unless, as said by TRUNKEY, J., in the latter case, " under such circumstances of acquiescence as clearly indicated the owner's design to surrender control, and donate the way to the exclusive use of the public."

The first, second, and third assignments of error are to the exclusion of questions by the defendants, on cross-examination of the commonwealth's witnesses, tending to show that the travel by the public across the railroad, to which the witnesses had testified, was not uniformly along the lines of the streets, but was at various points, and in every direction. These questions were relevant both upon the uniformity and definiteness of the use, and upon its adverse or permissive character. They struck the very key-note of the true inquiry, and should have been admitted. But, even without them, the evidence leaves no doubt whatever that the habit of the people was to go from point to point, diagonally, longitudinally, or by short cuts, as upon an open common, without any defined or located paths, and disregarding alike the tracks of the railroad and the lines of the plotted streets. Not a single witness really testifies to any other kind of use, more than twenty-one years before the erection of the fence. An occasional expression may seem to go further, but, put to the test of cross-examination, its force vanishes, and the general effect remains as stated.

But the case of the commonwealth is equally defective in another point. Such use as was shown was clearly not adverse. In the first place, the action of the municipal authorities was not only not adverse, but was uniformly based on the recognition of the railroad company's exclusive right. Thus, the agreements of 1850 and 1852, between the company and the district of Richmond, as to the widening of the roadway,

### Opinion of the Court.

provide that, if any embankment shall be required on the southerly side of the railroad, the company shall support it by a vertical wall, with a passage-way under the tracks at Cedar street.   Clearly, this provision conceded that the other streets on the plan were not at that time opened streets.   Again; the ordinances put in evidence, such as that of 24th March, 1871, for the paving of Thompson street, of 6th April, 1872, for the grading, and 13th May, 1872, for the paving of Belgrade street, and others relative to streets in the same neighborhood, all direct the work to stop at the line of the railroad, without in any instance attempting to cross.   And, in 1874, the city of Philadelphia entered into a carefully prepared and important contract with the railroad company for the erection of a bridge at Richmond street, in such manner as to require the elevation of the tracks across all the streets in the indictment; yet the city made no claim of any rights to opened streets at those points, nor even any suggestion as to public convenience in regard to them.   It would be difficult to find a series of acts amounting to a plainer disclaimer of right, and a more explicit admission that such use as existed was permissive only.

Nor is there any sufficient evidence of use attended with expenditure by the municipality, such as might by acquiescence establish a right in less than twenty-one years.   There is some evidence that the fence does, on the line of some of the streets, stand over a former pavement.   But the evidence is uncontradicted that the fence is on the line of the defendant's way, and, as already said, no authority has been shown for any paving across that line.   If the witnesses are not mistaken, the explanation may be that the pavers, in the absence of a fence, got beyond the line, and did that paving without authority; or, the paving may have been done up to the original right of way before the widening by agreement with the district of Richmond, and, if so, that agreement would clearly authorize the removal of the paving, or building a fence over it.   But, whatever the explanation may be, the fact of municipal expenditure and subsequent encroachment by the defendant is not proved, and the evidence certainly falls far short of the requirements of a criminal prosecution.

But, secondly, did the use by the public, irrespective of the action of the municipal authorities, establish a right of way?

The evidence fails to show it. All the witnesses agree that the crossing of the tracks by the public was not only rambling and unlocalized, as already discussed, but that it was always subject to interruption by trains and standing cars, which the people had to wait for, or climb over or under. There is no evidence that the railroad company arranged its business with any regard at all to such use, paid the slightest deference to it, or did anything at all but tacitly permit it. A use by such sufferance acquires no rights whatever. " Permissive trespasses . . . . . never raise the presumption of a right as against an individual; much less, as against a public body : " Susquehanna Co. v. Deans, 33 Pa. 133.

The same review of the evidence that shows the use to have been permissive, negatives the idea of implied dedication. Dedication, as was said by our Brother GREEN in Griffin's App., 109 Pa. 155, "is a matter of intention. . . . . Where there is no opposing proof, long-continued use by the public is evidence of an intent to dedicate, but it is by no means conclusive, and always yields to contrary proof of a satisfactory character;" and he cites with approval the passage from Goddard's Law of Easements, 182, that "the intention to dedicate ought to be clearly manifest in order to deprive a landowner of his property." The evidence in this case would fall far short of this requirement, even in a civil issue.

The result of the commonwealth's evidence, taken as a whole, is not at all doubtful. It shows the location and building of the railroad through an open country; the gradual extension of buildings and population on both sides of the line ; the use by the people of the railroad tracks in the same manner as the vacant lots alongside of them, for passage in any direction as on an open common, and the acquiescence of the railroad company in such use, without any concession of their own rights or convenience, until such use became a burden, and they terminated it by the fence complained of. Such acquiescence neither lost any rights to the company, nor gained any for the public. It was the ordinary course of the development of outlying surburban lands into city lots. While streets are only on paper, and no formal assertion of right is made by municipal authority, owners are not required to be churlish in interfering with the convenience of their neighbors. When the

Syllabus.

use becomes so general, uniform, defined, and continuous as to begin to assume the aspect of an assertion of right, then is time enough for the owner to enforce his exclusive possession. There is nothing more in this case. A private owner would clearly not be barred, and the rights of a corporation are the same. The jury should have been directed peremptorily to find a verdict of not guilty.

It is, no doubt, a serious inconvenience to the public to have this fence cutting the neighborhood in two for so long a distance. The growth of population and travel has reached a point where freer communication is necessary. But the remedy is plain. Either the councils or the property owners can at any time institute proceedings to have the streets opened in the regular, orderly, and legal way, with due regard to the interests and rights of all parties. It cannot be done by a short cut through the criminal court. It is not within our province to say what course should be followed, but we may be permitted to suggest that, as grade crossings would be highly dangerous and others expensive, the whole subject is one which should commend itself to the city councils for careful and wise treatment, by arrangement with the railroad company, if possible, in the same amicable spirit heretofore shown in the agreements of the city and the district of Richmond in regard to the same matter.

Judgment reversed.

